Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice Carl Anthony Walker presiding, case number 2-0-0516, James Priel versus David Priel. Hey, good afternoon everybody. I'm Justice Walker and I am here with me, Justice Hyman and Justice Pierce, and I'd like to start by asking the lawyers to please Amanda Oliver on behalf of James Priel, Petitioner Appellant. Yes, Kurt Richter. This is my son's laptop. That's why it says Jay Richter on there, but Kurt Richter on behalf of Respondent Appellate. Okay, thank you. And we'll start with you, Ms. Oliver. How much time do you need today? Thank you. I anticipate needing approximately 15 minutes with 3-5 minutes of that being reserved for rebuttal, please. Okay. And Mr. Richter, how much time do you need today? Is it Richter or Richter? You pronounce it Richter? Richter. Mr. Richter, how much time do you need? I couldn't hear you. Yes, Richter. No, I said, how much time do you need? I heard your name. About the same will be fine. Okay. And just so you all know, we generally give 20 minutes to each side. And if we do sometimes ask a lot of questions, and if we're asking a lot of questions, and you're not able to get to a particular point, please let us know. We'll give you a minute or two to wind up, even if we tell you that you're out of time. So with that, Ms. Oliver, please get us started. Thank you. May it please the court, counsel, we are appealing the January 8th, 2020, circuit court order granting Respondent Appellee's motion to enforce a post-nuptial agreement, which was treated as a motion for declaratory judgment on the basis of both procedural and substantive unconscionability. We do submit that there was such impropriety in the formation of this post-nuptial agreement to warrant a finding of procedural unconscionability. As more fully set forth in the record on appeal, the parties were married for 23 years. Jane was a stay-at-home mother and homemaker for the majority of that term to the party's four children, while Mr. Prill, a CPA, enjoyed a position more recently. We're aware of the facts. We're familiar with the case. Okay. Thank you, Your Honor. I have a question. Yes. There was mention in the brace about Jane wanting a fresh start. What's the relevance of that and how does that play into your arguments? Sure, Your Honor. The testimony by Mr. Prill on the record that Jane wanted a fresh start led into his additional testimony that he was giving her that by giving her no debt. There were no debts assigned to her from the marital estate. In fact, there were no liabilities in the marital estate at the time of the execution of the post-nuptial agreement. There was unencumbered properties, unencumbered vehicles. No mortgage on the house, right? There was no mortgage on any of the six properties, in fact.  That's correct. Yes. Wait, Ben. I'm sorry. I'll let you answer Justice Hyman's question. If there were no mortgages on any of the homes, no mortgages on any of the cars, there was no family debt. When you say that getting a fresh start means to start a new life with no debt, that doesn't make sense. Correct. That was Mr. Prill's testimony that she just wanted a fresh start, but that's what she told him throughout. What Ms. Prill's testimony was is that she essentially wanted to get out of the house. She needed to be removed from the marital home where she knew or at least believed that Mr. Prill was not going to leave and that she believed that she needed to sign this agreement prior to doing that. There was, I think, sufficient evidence in the record to support that. There was text messages and emails from Mr. Prill to Ms. Prill during the formation of this post-nuptial agreement where he said that she did need to sign before leaving the house, that he, quote, wouldn't hold her up. That was among some of the other promises that were made to her and representations. He said that he was going to interfere with the relationship with her children, didn't he? He did, Your Honor. I mean, it was a threat that he had made. It was. He told her, among other things, when during the portion of their discussions where they were talking about her hiring an attorney and he had recommended that she hire someone who was familiar with Mr. Richter and who had worked with him before, he told her all the while there was to be no changes made to this agreement. In one of those written conversations, communications rather, he told her that she could buckle up for a long, expensive process with the kids remaining in the status quo and the status quo was the children living in the home with him. And so that was one of the threats. Additionally, he brought the children into multiple conversations where he made her promise in front of the kids that she wouldn't touch his retirement accounts. Additionally, while on the topic of family, he also contacted her parents. Ms. Prill testified that he contacted her parents to assist in persuading her to sign the agreement. But now, what's the relevancy? And I know you didn't raise this just as Hyman actually did, but what's the relevancy of him saying that he's going to fight for the kids? Because when two people get married, sometimes they do fight as to who's going to get custody of the kids. That's a discussion that's had. That's a normal argument. So to say that somehow that now creates something else, I'm not sure what the significance is. Sure. I think it goes to what the mentality of Ms. Prill was throughout the discussions and the negotiations. She always felt like she was in a position, an inferior position to Mr. Prill during these discussions. And she was fearful. And when he told her that he would fight her on the child-related issues while there was one minor child remaining, she believed that. And she was concerned that that would be... The child was, I believe, what's 15, 16? He was 15 at the time. Yes. And I believe more so she thought that he was going to interfere with her relationship with the kids as well. But he never said that. No. He just told her he would fight her on the child-related issues. Yeah. And so that's not the same as saying that I'm going to interfere with your relationship with the kids. So one thing both of you probably need to tell them though is that it's really important for the children, for them to have loving, affectionate relationship with both successful people. But you can move on. You can go to your next... Yeah, you can move on. Unless you... Was she done answering your questions just this time? And I apologize for jumping in. No, that's fine. Yeah. Okay. You can move on. Thank you. I mentioned briefly in response to your honor, what we believe were manipulations by Mr. Pryl in Ms. Pryl obtaining an attorney throughout this. There were other representations that were made by Mr. Pryl as well that we believe did cause a level of duress. He presented several versions of spreadsheets and balance sheets to Ms. Pryl throughout their discussions and negotiations. None of those balance sheets were ultimately attached to the postnuptial agreement. When you use the word negotiations, is there anything in the record that would give us an idea of what you mean by negotiations? I mean, what was negotiated? Was there a back and forth between the husband and wife? Truthfully, it was more like discussions, although there were terms that were changed in the documents. So I think that that can be fairly interpreted somewhat as a negotiation. One of the specific- Were they changed by her before Jeffrey Marks or after she had discussions with Jeffrey? No, it was changed after her discussion with Mr. Marks. And the notable change in the document was there was never maintenance. There was always a waiver of maintenance. However, the property allocation in lieu of maintenance was titled under the section of maintenance where there was a waiver in the original version. And in the red line version, it was changed to fall under the property settlement. So I want to make sure I understand this correctly. I understand you to say that taking Mr. Marks out of the picture, was there any give and take between them with regard to the terms? There was mostly take, quite frankly, Your Honor. The record shows it was take. I mean, there were no back and forth discussions, a very little discussion. No negotiations is the way you kind of- Yes. Yes, that's accurate. How do you differentiate discussions from negotiations? I'm sorry. Could you repeat that, Your Honor? Differentiating discussion and negotiations. What's the difference? Yes. What's the difference? Yes. The difference is here, the two did talk. There was testimony from both of them that they did talk about the concept of disagreement. In fact, there are balance sheets that were prepared that both parties reviewed. And in fact, that Ms. Prill testifies that she relied upon those balance sheets. And so, they did discuss the terms. In terms where Your Honor asked about negotiations, I think that there was a lack of negotiating in this because the testimony that came in generally was with regard to Mr. Prill taking some benefit away from Mrs. Prill during their discussions, taking away a $30,000 furniture allowance, taking away Kwanzaa court from her, which appeared on all of the balance sheets as a property that was to be awarded to her. Mr. Prill testified even at trial that Ms. Prill would live rent-free at the Beachwood property, when in fact, the agreement said she would pay all expenses associated with that property. The judge didn't find him being very forthcoming. He did not. He did not have pleasant things to say about Mr. Prill and his ruling. Now, with regard to Mr. Marks, was there an attorney-client relationship? Both of them said there was not. Okay. And if there had been, would he have been able to testify as he did with regard to these discussions? He would have been able to testify with a waiver from Ms. Prill. Did she give a waiver or was it at any time? She did. She did. She did. So she gave a waiver in this case then. So if there was a need for, I guess, there's always a need for a waiver when an attorney testifies, whether or not the attorney is actually representing you. Once you go to the consultation, they obtain confidential information. They can't disclose it. So the waiver would have been required whether he was her attorney or not. Whether he was officially her attorney, I should say, or not. Correct. So, but he did make modifications to the agreement. And he also asked that it be transformed into a post-nuptial agreement. He did. So she did get legal advice from him. She got, yes. I mean, she got advice from him on a legal document. I think it's fair to say she got legal advice in that nature. But I think that the changes that were made, the red lines that were made to that document first had really no legal implication. The movement of the property settlement from an article titled maintenance to an article titled property settlement had no legal significance. It didn't change the tax consequences of her receipt of that property. It didn't change the duration over which that property settlement was payable. And also significantly, Mr. Marks testified that he didn't recall seeing any balance sheet. He never was provided with a balance sheet or any other document that set forth the assets at the time of the execution of the post-nuptial agreement or when he was reviewing the post-nuptial agreement. What about one of the things he testified to, Marks, was that he had known her through real estate transactions and he considered her a colleague and a work friend. Is that correct? That's correct. Okay. So my question is, he testified he met her once to discuss this at a bar. Yes. And he said he remembered her as distressed, frazzled, and otherwise not acting herself. How does that play into your argument, if at all? Correct. I think it goes to the duress that Ms. Pearl was feeling, the rush that she felt to have this sign. He also testified that she told him that she couldn't make changes, that she appeared fearful to make any types of changes that were substantive to this agreement. And it ties in with the testimony that came in from Ms. Pearl also as to what was said by Mr. Pearl to her throughout. That he constantly told her, even when she was looking for an attorney, that she was to tell that attorney that there was an agreement, that it was a done deal and there weren't to be any changes, which was always followed up by the threat of what would happen if there were. She could buckle in for a long, expensive ride, that it would alienate the two of them, that there would be a status quo with the kids living in the house. And so, I think that it corroborated, Mr. Marks corroborated Ms. Pearl's testimony as to how she was feeling during the formation and ultimately the execution of this post-nuptial agreement. In that regard, I just want to make sure I have that correct. The evidence at the hearing showed that the husband did speak about various issues, as you said before, in front of the children, bringing in children. That didn't happen just a few times. My understanding was there was something that happened quite a few times. Is that correct? That's correct. It happened quite a few times. And the testimony came in that it was to have her promise in front of the children that she would not touch his retirement accounts. That seemed to be one of the things that he was most interested in the children hearing, as though them hearing it would confirm it. And then, like I mentioned earlier, he also contacted her parents to bring them in. What about the... There were suggestions about him talking about this quite frequently with her. I mean, it was a constant discussion with her, whether it's two ways or not. I'm just saying that he was someone, as I read the record, that kept prompting her on this over and over and over again. That's exactly right, Your Honor. The testimony came in from both of them that this is something that was discussed on a nightly basis from July 2017 through August 2017. While I think that they had different interpretations of what that meant, Ms. Prill's testimony was that it was essentially a barrage of communications, that she was these discussions took place. Well, in that vein, everything that you've said, as far as the facts, were all brought forth in the hearing, correct? In front of the judge. And the judge, wouldn't you agree, has the responsibility to hear that testimony and to give it whatever weight he deems appropriate in entering his ruling, correct? Correct. Okay. So what standard are you saying that the judge failed to meet in order to obtain the relief that you're requesting? What did the judge do wrong that harmed your client, justifying a reversal of the ruling? Sure. So first of all, I believe that the circuit court's ruling was based almost entirely on the facts related to procedural unconscionability, with little reference to any basis for a finding of the agreement to be actually substantively conscionable. Certainly, the circuit court is in the best position to assess the credibility of the witnesses, but I believe that absent that assessment of credibility, there was still a misapplication of fact to the law, because I do think that the facts in this case warrant a finding of procedural unconscionability, the facts that we just went through. And perhaps more importantly, I believe that the facts of this case warrant a finding of substantive unconscionability, which would be regardless of the judge's assessment of credibility of the witnesses. And why do you say there's a substantive failure here? Certainly. Substantively speaking, looking at the position of the parties immediately after the entry of the agreement left Jane with a substantially lower percentage of the marital estate than she would have been entitled to or had received at a trial or in fairness or in any type of equity. Similarly, despite a 23-year marriage and a 48-year-old stay-at-home essentially mother for Ms. Prill received no maintenance, no child support from this agreement. I do not believe that the division of the assets was in just proportion like the Illinois Marriage Dissolution of Marriage Act would require. Jane at best received 27% of the marital estate and at worst 13.7% of the marital estate. And those differences coming in based on the value assigned to the stock options. She received under 7% of the parties. Let me interrupt there for one second. Was there any expert testimony as to the value of the stock options? There was not. The only testimony as to value of the stock options came in through Mr. Prill, who is the CFO of the company. And the testimony that came in was that a month prior to the signing or the execution of the postnuptial agreement, Mr. Prill told Ms. Prill that the value of the stocks was zero. And one month after the entry of the or the execution of the postnuptial agreement, Mr. Prill told Ms. Prill that the value was $2.3 million. And that's when he was the acting CFO of the company. Okay. The marital estate was worth either $3.8 million or $5.9 million. And Ms. Prill received $823,000 in total. $247,000 of that was contained in the children's UPMA accounts. Three of those children were emancipated at the time that the parties signed the postnuptial agreement. And $240,000 of that was payable in an unsecured five-year monthly installment payment plan. She received only one of the party's six pieces of property, while Mr. Prill received five of the six pieces of property, four of which were... The fact is the judge found it was unfair. Even the judge said this was unfair, right? Yes. The judge said it was unfair. Right. And he also said it was a close case. He called it a difficult case. Yes. Went back and forth in the case. Yes. Okay. So, but the fact that it's not fair, that alone doesn't get you where you need to be. Right. So what is it, unfair plus, what is it that you say makes it get to the unconscionability? It is, I believe, oppressive. I believe that it is overly one-sided in Mr. Prill's favor. That's the unfairness. That's the unfairness, right? Correct. I already said, the judge acknowledged the unfairness. He said it was one-sided. Right. But that wasn't enough. So I'm saying to you, what is it that brings it that we should rule in your favor? Well, I think even with a zero value assigned to these stocks, it's substantively unconscionable. If you look at the percentages, they do align with the percentages and the disparity in previous cases, like Richardson, that would warrant a finding of substantive unconscionability. Even in the Richardson case, despite receiving only 7.55% of the marital estate, the wife in that case got a $10,000 per month maintenance award. She got a Northwestern college education. She got a car. And she had a lawyer. And she had a lawyer. And Jane received, in this case, somewhere between 13% and 27% of the marital estate with no maintenance. 27%. I mean, what is it? Why is it? That's a pretty huge spread. Although it's still 75% less, approximately, than he got. But you're adding in there stuff that wasn't hers. Am I right? I mean... No, that's not correct, Your Honor. What I'm adding into that is a $2.3 million valuation of the stock. The circuit court's ruling is devoid of a valuation on the stock. We don't know what the court considered in terms of that stock. And so that's why I'm presenting this court with the two percentages. Not to be confusing, not to be misleading, but just to be transparent. But you said that the court only got one piece of evidence on that issue. So that was Mr. Peral's testimony, correct? Correct. Because it was an expert testimony. You just answered Justice Pierce's question earlier. You said there was no expert testimony. And you said that Mrs. Peral never testified to the value. So there was only one person that testified to the value. So the judge only had... Unless the judge, which the judge wouldn't do, do his own research, the only information he has from the trial or research would be inappropriate. So the only information he has is the testimony of Mr. Peral. Correct. But the testimony of Mr. Peral... Sure. Because Mr. Peral testified to two... Mr. Peral essentially presented two values. There was a written document from Mr. Peral that was admitted into evidence wherein he valued the stock at $2.3 million. And then there was testimony from Mr. Peral where he said it was worth nothing. Testimony, that's contradicting what you said earlier. And maybe there was testimony, but earlier you said that that's what he told her prior to signing the agreement. That's correct. He said prior to signing... Okay, so that's what's correct. That prior to signing the agreement, you're saying that he allegedly told her that the stock was worthless. And then at trial, he testified it was worth $2.3 million. And then you're saying that there was some evidence that shows sometime later after trial, the value was over $5 million. Is that what happened? No, I'm sorry. I'm going to correct where I'm speaking. Sure, I'm sorry. Perhaps I wasn't clear. One month prior to the entry of the agreement, there was communication sent to Ms. Peral stating the value of the stocks was zero. One month after the execution of the agreement in September of 2017. So in October 2017, there was another written communication sent from Mr. Peral to Ms. Peral stating that the value of the stocks was $2.3 million. Then the trial that occurred sometime later is when he testified also that the value was zero. And he testified that, in fact, he had lied about the $2.3 million value. And that was how the testimony came in. Well, why is this? Excuse me. So when you say that she got 13% of the estate, you're including in the total estate's value, a $2.5 million value of these options. A 2.3, but yes. Yeah. All right. Thank you. Sorry. No problem. The Mr. Peral's attorney say this is buyer's remorse. What's your response? I don't think that it is. And I don't think under, you know, I don't think that under substantive unconscionability, particularly her state of mind is that it matters. I think that the court has the ability to look at the agreement on its face and determine whether it leaves them in a position of such disparity, such that immediately after the execution of it, it's found to be one-sided or oppressive. And I think that in this case, it was. I don't think that it's buyer's remorse. I think that Ms. Peral honestly did not know what she was getting into. She testified at trial that there were certain portions of this agreement that she did not understand, that she thought that she was getting things out of this, such as a Quonset court property that had been presented to her and all of the subsequent balance sheets. In fact, the balance sheets that were admitted into evidence that were prepared by Mr. Peral, and she believed that she was actually getting those. She wasn't, it was, it was not part of the ultimate agreement. So I don't think that it's buyer's remorse. I think buyer's remorse would indicate that she knew what she was getting into. And now she's regretful. I don't think that's the case here. But, and the judge said she got what she wanted. You agree? Of course you disagree. I disagree because what, again, what Ms. Peral wanted was to get out of the house. I agree that she got that. I believe what the judge was suggesting, however, is that she got the terms that she wanted, and she certainly did not. Now, Counselor, you're out of time, but I'll give you a minute to wind down, and then you'll still have time for rebuttal. Um, I think, frankly, um, essentially, your honors touched on, um, almost all the points that I wanted to touch on as well. So, um, I'm happy for you to move on to counsel. Okay. Thank you. Mr. Richter? Yes, uh, I'll try to be brief here. I'd like to point out that at the beginning over here, that this whole issue about this agreement was Ms. Prill's. She was the one who was driving this train here. She's the one who wanted to get out. She's the one who wanted to have some kind of agreement in place before she left. So what? So what? So what? What's that matter? What's that have to do with unconscionability? All right. Well, I guess what I'm getting at over here is that the parties jointly negotiated the terms of the agreement. What the court I'm sure is aware that the parties that actually entered into a marital separation agreement and all the documents that have a marital separation go through. And that was stopped when Ms. Prill decided that she would, based on the advice of Mr. Marks, that she was better off with a postnuptial agreement. Well, but, but again, uh, what do you mean by negotiating? They went back and forth over the terms of the, uh, the ultimate agreement would be. But what, what terms they go back and forth then? About the property distributions, about the, uh, the maintenance, everything that went into the final balance sheets. Where's that in the record? It was a testimony of the parties, I believe. The judge didn't believe the, your client. So the judge said he didn't believe your client, didn't he? He, yeah, the judge said he didn't really didn't believe either of them. That is true too, but on certain different things. Uh, when he called you, he used the word jerk in reference to your client. So Scrooge McDuck. Yes, I know. Yeah. Um, okay. So, uh, because consular characterized it, uh, as discussions, not as much a negotiation, uh, uh, back and forth that this was, uh, presented to her and, uh, she was pressed to sign it. Uh, being told, you know, you can't get a lawyer. Uh, you gotta hire somebody. I want you to hire and so forth. Well, if I could just point out the post-nuptial agreement was actually entered into by the parties after Ms. Prill had already vacated the residence. One of the things that she wanted to, that she had included in the post-nuptial agreement and the, uh, the, uh, marital separation agreement was the right to have the use of one of the properties. That was something that she got in addition to what they had originally agreed to in the marital separation agreement. And I think the record is clear that she got virtually all of the, what she had, the assets that she had coming to her under the terms of the agreement prior to the execution of the post-nuptial agreement. She had the 300,000. She had the use of the property. She had the various benefits, even though there was no signed agreement in place at that time. She's the one who wanted to get this thing done and move on. So, uh, do you, uh, have any evidence? Did anybody test my contrary to the fact that, uh, Jeffrey Marx said that, uh, he remembers her as distressed, frazzled in other ways, not acting herself during this period. I mean, that was his testimony, if I recall. What? Excuse me. That was his testimony. Is there any other testimony that contradicts that? Well, no, because it was a private meeting between. No, but nobody else said anything other than, you know, the records reflects at that period in time, uh, when, uh, when she said she was pressured and stressed and so forth, we have one independent witness who said, uh, you know, this wasn't the person that he knew as his friend, correct? Right. Okay. So, Mr. Richter, let me ask, I'm sure you're familiar with the marriage of Richardson and the marriage of Captain Young. Why is it that this court shouldn't follow those cases? Well, for the exact reason why the trial judge, just because it's not equal does not mean it's unconscionable. She got, she negotiated for, for a bargain. She got the bargain that she wanted. She got all, everything she had coming to her. And after the fact, she decided that she wanted to get another bite at the apple here. This is not a situation with the parties. The agreements were signed independently of the parties. She's the one who got there, took them in to the bank to have them notarized. She's the one who had the deeds notarized. She's the one who took care of all the mechanics of getting the agreements finalized here. Why is that relevant? Why is that relevant? Because it goes to show us the state of mind, that she was not pressured into doing anything here. She didn't, she got her own, of her own will. She could still feel pressure. She could feel extremely pressured. I mean, I don't think one necessarily means the other. She was pressured to do this. How long was it between the time that she signed these, that everybody signed? Oh, it was September of 2016, if I'm not mistaken. September 17th. Yes, Judge. And she filed her lawsuit in early 2017 or sometime in 2017? The marital separation agreement was signed on August 31st. The postnuptial was September 17th. And I think she filed her dissolution action in the beginning of November of that year. Okay. When she filed her dissolution action, did she, was she represented by council? Yes, by Ms. Oliver. The great Ms. Oliver? The great, I'll stipulate to that, yes. What about the fact that the agreement itself doesn't have any balance sheets or specific documentation in it with regard to the agreement? What's your response to that? Well, the parties put together an agreement based upon what they had gone through to reach the final end result. It's, in my experience, it's not very often when you attach a schedule of specifics, as long as you identify what it is that each party is getting. Well, you thought it was important enough to put it into your brief. Is that correct? What was that, Your Honor? You thought it's important enough to have a net worth balance sheet on your brief. Well, yeah, because that was part of the evidence. It was at trial, yes. Okay, and also, before I ask a question about that, you did, it was, the testimony was that you drafted the agreement, is that correct? Yes. Okay, the net worth balance sheet that's attached to page 14 of your brief, if I'm reading it correctly, it says appellant, net worth of percentage, an appellant is Jane, and appellee is your client, am I correct in that? Yes, he is the appellant. And you have net worth of Jane at 65%, and appellee at 35%. Right, this is a, based upon an exhibit that Mr. Prill created after, in fact, these are what he considered to be a resulting net worth balance sheet after the agreements were signed, showing what the distributions were of assets and liabilities to the parties. There were no liabilities at the time. Right. So I don't understand that. So those liabilities weren't there when they made this agreement. This is after the fact. It really doesn't have any substance or any effect upon our decision, does it? No, it's just used to show that as reliance upon the agreement, this is what my client undertook to do. Well, it's not under the agreement because he said there was no mortgages, you know, all these things were not there, we just heard that. And you just said, I mean, it's after the fact. And he's saying that after the fact, she got two thirds and he got one third. Is that your position before us? Right. Is that your position before us? Yes. Okay. So when Council said the high rate for her was 28, I think 19% to 28 was her range. And you're saying, actually, Jane got 65%. That's what you're saying that we're going to take into account. That's how it comes out after the fact. Well, after the fact, how long after the fact? The day after? No, we're talking about a space of some months, I believe. Oh, so all of a sudden afterwards, he got all these liabilities, $1.1 million in liabilities after the fact? Right. He had to take out loans against the property to help fund this billing. But that has nothing to do with the agreement. That's correct, Your Honor. Okay. So again, is there any reason we should take account of this net worth balance sheet? Again, it was for demonstrative purposes, and it does not really go to the situation at the time the parties entered into the agreement. Okay. Anything further, Mr. Rickey? Well, I just like to, again, I don't want to repeat myself over here. I think it's just very telling that Ms. Grill sought the advice of two attorneys. The second attorney who had matrimonial law experience took the marital separation agreement made redline changes that were incorporated into a final MSA. She got an additional piece of property, used an additional piece of property, which she did not have under the marital separation agreement. I think Judge Carr's analysis is correct. She got what she wanted. She has buyer's remorse now. Now she thinks after the fact, gee, maybe I could have done or should have done better than what I did. But she got what she bargained for. That's my position. One of the things you say in your brief is that she was smart. Well, yeah, that's Judge Carr. Okay. Does being smart have anything to do with this case, whether she's smart or not? Well, she has a business background. This is not just, she's not a high school graduate, has been a housewife for 20 plus years. Why should that make a difference? Does the law have a different, under the contract law, do we treat people who have degrees differently than we treat people who don't have degrees? No, we don't. But I think it just goes to show they're trying to paint the picture that my client was the sophisticated businessman and her client was this poor stay-at-home mom who didn't understand anything of a financial nature. And I think the record shows that to be the contrary. Well, but it isn't financial nature as much as this case is about a separation agreement of a marriage. She didn't have any knowledge about separation in marriage or law. There's nothing in the record shows she was a lawyer or had legal training or was aware of divorce rules and so forth, was there? No, but that's why she sought the advice of an attorney to go through. Which she didn't really get. I mean, the first woman, the first attorney, she wouldn't represent her because she was told she couldn't say anything. And the second didn't represent her because she never retained him. It was an informal discussion. Right, they had an ongoing business relationship. He did bachelorette work, now he does transactional law and she refers a lot of real estate closings to him, so. Thank you. Thank you. Anything further, Mr. Richter? No, I think that covers it. Thank you. And Ms. Oliver. Thank you, your honors. The balance sheet that counsel touched on that is set forth on page 14 of his brief is in fact not just numbers that would suggest how Mr. Prill is going to maintain his obligation set forth under the post-nuptial agreement. In fact, it is much more misleading than that. It includes in appellant Ms. Prill's column, the very first one that the court can look at, it includes in the cash received by her, the UTMA accounts, which I previously had stated are approximately $237,000 in value. Which even the circuit court opined, she would not receive. And what's missing from Mr. Prill, appellee's column, the very first number where it says it's $100,000, what's missing from that is a 529 accounts, which total about $503,000. So there's intentional omissions on Mr. Prill's side and intentional inclusions on Ms. Prill's side that is sort of representative of the level of misrepresentation that went throughout this case in the adjustment of these balance sheets. Similarly, if your honors look down to the row titled vehicles and personal property, it's much different than the vehicles values that were agreed to at trial, that both parties, that testimony came in through Ms. Prill as to what they were and it was unrebutted by Mr. Prill. Yet we see different values here and I suggest the basis for that is there's a personal property column that just simply doesn't exist in any other balance sheet would have to be about $130,000. And so again, this is- I'd like to ask you a question and I know I apologize to my fellow justice, but I just like to go through this a little bit because there seems to be some misrepresentations here and this is important. First, before we talk about the assets, let's talk about the liabilities because you said there were no, at the time that this agreement was signed, there were no mortgages, et cetera. Of the numbers that are put under Apelli's column, are there any of those that should be taken out? All of the liabilities should be taken out of Apelli's column. So the- And we're not trying to back up for that. I mean, that's in the judge's- That's in the transcript, that's also in all of the balance sheets that were submitted, offered and entered into evidence. There's no liabilities. The first time a liability appears in this matter, your honors, is when Mr. Prill testified to it and the court was very clear that it didn't believe that these liabilities existed. Ms. Prill testified there was no liabilities, there were in fact no liabilities. And so the first time we see them is on Mr. Prill's demonstrative exhibit that he prepared for trial in December of 2018. That's the first time we see a liability come into play. So I'm going to put an X through the liabilities. Now let's go to the assets. Yes. First assets, first line is, cash received by Appellant Apelli, it says almost 600 for Appellant and 100 for the Apelli. Right. So what was actually assigned to Mr. Prill pursuant to the terms of the post-nuptial agreement was $470,000 in cash and investment accounts. And what about- He received then in additional, and to my client, $1,100. $1,100? Not $596? That's correct. Where's the $596,000? The $596,000 is because Mr. Prill is including the value of the children's UPMA accounts in that column. So it's nearly $1,100 on your side and about $470,000 on his side? That's correct. Okay. All right. And then the balance sheet, the actual balance sheet that's representative of the post-nuptial agreement terms, which is missing here is, in fact, the UPMA accounts and the 529s. However, the court wants to handle those. But again, in this balance sheet, Mr. Prill included them on Mrs. Prill's side and did not include them on his own. Okay. Notably. Excuse me, Justice Simon. What document are we talking about? The one that you just discussed. Page 14? I'm sorry? Is it the one on page 14? I think she's referring to the one on page 14. I am. It's page 14 of the response. Which was entered into evidence at the hearing? It was not. This is the first time I've seen this balance sheet as well. And it only appears in this brief. It's not. That was my question. Was this document or exhibit part of the trial evidence? It was not, Your Honor. Okay. So why are we talking about it? Maybe that's a question for... Well, I'm just asking, why are we talking about it? It's not in evidence. A question for Mr. Richter because it's his brief. But it's in his brief and I asked him questions about it and he put it in his brief. He said his client prepared it. I'm not arguing. I'm just making an observation. I don't care if it flew in through the transom window. It wasn't before the trial court. It wasn't considered by the trial court. It wasn't part of his ultimate judgment or a basis for his judgment. It's a document that is... With my fellow colleagues permission, I would like that question answered by Mr. Richter. Sure. Well, the numbers here, I believe were taken from exhibit number 10, which were admitted to evidence. So what was your purpose in attaching this to your appellate briefing? It was just simply to point out the resulting assets and liabilities of the parties as a result of the carrying out the terms of the post-nuptial agreement. Okay. And would you agree that this was not submitted to the trial court? There was a exhibit number 10, which was submitted to the trial court, which contains, I think, these numbers. Okay. I'm sorry, Justice Simon. That's fine. I appreciate it. I think I would ask Ms. Oliver for a response. It's not the same, your honors. I believe that what counsel is referring to is in his exhibit. I don't know if it's before your honors, but it's sub E49 of the record. And in fact, it's different amounts. In fact, if you look simply to the total real estate that each of them were to receive, in the exhibit that was entered into evidence, Ms. Prill is to receive $323,100, which I would also just alert the court is wrong because it includes the value of in the post-nuptial agreement. And it is a total real estate value to Mr. Prill of $1,342,750. That is not the same as the values that are set forth on the net worth balance sheet that's contained in page 14 of the brief. I could go through the document further, but that's the first example that jumps off the page. All right. May I just like to verify, could you say that exhibit 10 that Mr. Richter refers to is exhibit sub E49? Of the record. Of the record. Is that Mr. Richter? Is that correct? I just want to make sure. Okay. I just want to make sure we're talking about the same document just so we know. All right. If you want to proceed Ms. Oliver with finishing the rest of my question, which had to do with the assets. Certainly your honor. Okay. The retirement accounts as set forth on the balance sheet that Mr. Richter has prepared are, they are slightly different. It's it, the value that was awarded to Ms. Prill is actually the $59,266. The value to that was assigned to David is actually less than that in the post-nuptial agreement. I anticipate that's based on the fluctuation in value of those accounts, which again, I believe that Mr. Prill is using as of the preparation of this, some, I don't know, some present value, perhaps some value between the trial date and now I'm not certain. The vehicles and personal property in accordance with the post-nuptial agreement, Ms. Prill received $35,700 in vehicles. Mr. Prill received $93,595 worth of vehicles. That's not what is set forth on this balance sheet. And then the non-marital assets where Mr. Prill deducts $304,000 from his side of the testified to, there was never any offer of non-marital property. I don't know what that is. And in looking in the exhibit that was admitted into evidence, the demonstrative exhibit that was prepared by Mr. Prill in December, 2018, it doesn't appear on there as well either. And then as Your Honor went through previously, thereafter, it's simply all these fictitious liabilities. So you've, you've completed your, your response. I thank you. Yes, Your Honor. Okay. So Ms. Oliver, we'll give you an opportunity to wind down. You're actually out of time right now. Okay. Thank you, Your Honor. Not to go back over the facts of the case, but it is our position based on what was said here today and what's contained in our briefs that the postnuptial agreement that was entered into between the parties is both procedurally and substantively unconscionable. And respectfully, we would ask this court to reverse and remand the decision of the trial court with instructions. Thank you. And thank you both for your briefs and your argument. Thank you, Your Honor. Have a good day. You as well.